IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs June 6, 2017

## SEBASTIAN PEGUES v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. 12-06111        J. Robert Carter, Jr., Judge**

_____

**No. W2016-02489-CCA-R3-PC**

_____

A Shelby County jury convicted the Petitioner, Sebastian Pegues, of two counts of first degree felony murder, one count of aggravated child abuse, and one count of aggravated child neglect, and the trial court sentenced him to life plus twenty years of incarceration. This court affirmed the Petitioner's convictions and sentence on appeal. *State v. Sebastian Pegues*, No. W2014-00854-CCA-R3-CD, 2015 WL 3404736, at *1 (Tenn. Crim. App., at Jackson, May 27, 2015), *no Tenn. R. App. P. 11 application filed*. The Petitioner filed a petition for post-conviction relief alleging that he received the ineffective assistance of counsel because his trial counsel ineffectively cross-examined the medical examiner. After a hearing, the post-conviction court denied relief. We affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which THOMAS T. WOODALL, P.J., and NORMA MCGEE OGLE, J., joined.

Samuel J. Muldavin, Memphis, Tennessee, for the appellant, Sebastian Pegues.

Herbert H. Slatery III, Attorney General and Reporter; Zachary T. Hinkle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Carrie S. Bush, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION
### I. Facts
### A. Trial

This case arises from the death of the Petitioner's then three-month-old stepdaughter. We summarize the facts presented at the Petitioner's trial. On June 25, 2012, the Petitioner called 911 to report that he needed an ambulance for his infant daughter who was breathing slowly. He expressed fear that the infant was going to die. The 911 operator instructed the Petitioner on how to conduct CPR, and the Petitioner did so until paramedics arrived.

When paramedics arrived, the Petitioner informed them that his daughter, the victim, was having trouble breathing. The Petitioner said that the victim had been sick, had taken medication, and was not breathing well. A Paramedic noted that the victim was "definitely . . . in distress." He said that he immediately noticed that the victim was "very depressed like lethargic." He stated that the victim had a "fixed" look on her face and was not breathing at a normal rate for a baby. The Petitioner reported he had given the victim a small dose of Tylenol. The ambulance arrived quickly to transport the victim, who was breathing but "deteriorating," to the hospital. The victim's heart stopped on the way to the hospital but paramedics revived her.

Officers responding to the scene found the Petitioner, the victim, and a seven or eight-year-old girl. The Petitioner told officers that he was trying to sleep and that the victim would not stop crying. He called Ms. Pegues, the victim's mother, who told him to give the victim some Tylenol to help her sleep. The Petitioner told the officers that the victim was having difficulty breathing and that he had given her medication. Officers noted that the other child in the house, K.H., who was seven or eight years old, was concerned about the victim. K.H. told officers that the victim cried a lot, and it frustrated the Petitioner. K.H. said "something about a who[p]ping."

The Deputy Chief Medical Examiner for Shelby County, Dr. Marco Ross, testified as an expert in forensic pathology about his findings during the victim's autopsy.

[The victim] weighed sixteen pounds and was three months old at the time of the autopsy.

In his examination of the victim's body, Dr. Ross found a bruise on her right temple consistent with blunt force trauma to that area. On the back of the victim's head, Dr. Ross found a hemorrhage, which he explained as an area of bleeding in the tissue. He testified that there was a similar area of hemorrhage on the right front part of the victim's scalp. Dr. Ross said that, after removing part of the victim's skull, he found a small area of hemorrhage on the right side of the victim's brain. Dr. Ross identified pictures of those injuries, and they were admitted as evidence. He stated that all of the victim's injuries to her head appeared to be acute injuries, meaning that they occurred within twenty-four hours before her death. Dr. Ross testified that it would have taken a minimum of two blows to the victim's head to create those injuries.

Dr. Ross identified pictures of areas of bruising on the victim's torso region, specifically her lower chest and upper part of her abdomen. Dr. Ross testified that he found injuries on the victim's ribs. The victim's fifth

2

through ninth ribs were fractured on her right side, and her third through eighth ribs were fractured on her left side. The eighth and ninth ribs on her backside, where they attach to the spine, had "calluses" indicative of older fractures to those ribs. He testified that the injuries to the ribs on her right side also appeared to be acute. The injuries to her left side were a minimum of two weeks old. Pictures of the injuries to the victim's ribs were identified and admitted as evidence.

Dr. Ross testified that he could not completely rule out that the victim's rib injuries were caused by CPR, but he stated that his interpretation of the injuries was more consistent with tpressure or impact from the side of the body, rather than the front, which would be consistent with CPR. He agreed that the injuries were more consistent with injuries sustained from blunt force trauma. He testified that there were hemorrhages in the immediate vicinity of the fractured ribs consistent with blunt force trauma. Based on the fracture lines on the victim's ribs, Dr. Ross testified that the victim had suffered broken ribs during three different events.

Dr. Ross testified that the victim had suffered bleeding in her right lung, as well as in her heart. Pictures of the bleeding in the victim's lung and heart were identified and admitted as evidence into the record. The presence of the hemorrhage inside the victim's lung indicated that the victim had suffered blunt force trauma rather than injuries sustained during CPR. Dr. Ross testified that the victim had two lacerations on her liver, which he described as "complex," indicative of a "crush type of injury to the liver." Dr. Ross agreed that it would take a "significant amount of force" to cause this type of injury to the liver. He characterized the injuries to the victim's liver as severe, caused by a very significant impact.

Dr. Ross testified that the victim also suffered hemorrhaging to her duodenum, the connection between her stomach and small intestine, as well as to her pancreas and kidney. He testified that the victim's adrenal gland was split open by a large laceration consistent with a severe injury. He agreed that an adult punching the victim would cause that type of laceration. Dr. Ross testified that, due to her internal injuries, the victim had bled at least half of her blood volume internally.

Dr. Ross testified that he determined the cause of the victim's death to be multiple blunt force injuries. He stated that the victim's injuries were very severe and "associated with a high mortality." He testified that he typically associated these types of injuries with car accidents because of the

amount of force necessary to cause the same crushing of the liver suffered by the victim. He stated that, had the victim been resuscitated, she probably would have had to have her liver removed to stop the internal bleeding. He described the injury to her liver as "very, very severe" and stated that the victim would have been in severe pain after sustaining these injuries. Dr. Ross stated that the victim likely went into shock within a matter of minutes after sustaining the injury to her liver. Based on the severity of the injuries, Dr. Ross stated that the victim probably suffered them close to the time that she died.

On cross-examination, Dr. Ross agreed that the victim arrived at his office with medical equipment on her body, left in place so that he could ascertain whether any of her injuries or marks were related to the medical equipment. He clarified that the temple, where the victim had a bruise, was on the side of the head between the eye and the ear. He agreed that, near the injury to her temple, the victim had a mark where tape had been placed on her head by medical personnel. He stated that the tape and any piece of medical equipment that had been taped to her head would not have caused her injury. Dr. Ross stated that the injuries to the child's liver and abdomen would have been by someone forcefully squeezing her abdomen, or punching or kicking her abdomen. He denied that her injuries could have come from being hit with a belt buckle. He denied that her injuries were consistent with "Shaken Baby Syndrome."

*Pegues*, 2015 WL 3404736, at *2-3.

Teresa Pegues, the victim's mother and the Petitioner's wife, testified that at the time of the victim's death, the victim lived with the Petitioner, Ms. Pegues, and Ms. Pegues's daughter, K.H., of whom Ms. Pegues no longer had custody. Ms. Pegues recalled that on June 25, 2012, she had to be at work at 6:00 a.m. When she left for work that day, the victim and K.H. were still asleep, and the Petitioner was awake. She stated that the victim slept in the master bedroom in a crib. Ms. Pegues stated that the victim was acting normally the night before and was very active, smiling, and trying to stand up. About nine or ten o'clock in the morning on June 25, 2012, the Petitioner called Ms. Pegues at work and told her that the victim was breathing "funny" and "kind of wheezing." Ms. Pegues told him to give the victim Tylenol drops, which had been prescribed for the victim during a prior episode when she was wheezing. The Petitioner later called her and said that emergency services were at their house and that she should go to the hospital.

Ms. Pegues went to the hospital and followed the doctor's recommendation that life support not be sustained for the victim, whose heart had stopped multiple times. She

4

asked social workers for assistance in informing K.H. about the victim's death. K.H. burst into tears when she heard that the victim had died. She was scared and upset and shouted, "mama I told you that dad was spanking the baby." Ms. Pegues agreed that she knew what K.H. was "talking about." She said that K.H. left the hospital with her grandmother while Ms. Pegues spoke to the police and the Department of Children's Services. Ms. Pegues agreed that, at the time of trial, she was under indictment for aggravated child neglect related to the victim's death and had retained an attorney after being arrested on November 12, 2012. She recalled that investigators arrested the Defendant the day after, on November 13, 2012, because investigators "felt like he was the cause of [the victim's] death."

Ms. Pegues stated that, on one occasion, K.H. had scratched the victim's back and left red marks. Ms. Pegues agreed that she had said K.H. had a jealousy issue when Ms. Pegues would buy toys for the victim or when she or other adults were giving the victim attention. Ms. Pegues agreed that she did not leave K.H. alone with the baby because she had scratched the baby and because of K.H.'s jealousy issues.

Ms. Pegues said that, when she was at work, the Petitioner would be at home taking care of the victim and K.H. Ms. Pegues stated that, while in the Petitioner's care, the victim had been taken to the hospital on one occasion before her death, on April 26, 2012, when she was just two months old. K.H. was not home on this occasion. The Petitioner called Ms. Pegues at work and told her the victim had fallen out of the bed. Ms. Pegues said the victim's left side was "completely swollen" after the fall, and the victim's eyes were swollen shut. The Petitioner told Ms. Pegues that he left the victim on the bed with him while he slept, and she fell onto the floor while he was sleeping.

Ms. Pegues stated that she explained the difference between spanking and burping the victim to K.H., because K.H. alleged that the Petitioner was "whipping" the victim. Ms. Pegues asked K.H. to demonstrate the Petitioner's actions, and Ms. Pegues told K.H. that he was burping the victim or "pat[ting] the [victim] on the back." Ms. Pegues stated that K.H. was not strong enough to have inflicted these injuries on the victim.

Felicia Lobbins, a medical social worker, was present when Ms. Pegues told K.H. about the victim's death. Ms. Lobbins stated that Ms. Pegues told K.H. that the victim had died, and K.H. "acted like a much older child. She immediately said to [Ms. Pegues that] she wanted to know what happened." K.H.'s voice was raised, and she was "angry" and "upset." K.H. told Ms. Pegues that the Petitioner was "who[p]ping" the victim while Ms. Pegues was at work all day and that the Petitioner had been "who [p]ping" the victim that morning. Ms. Pegues and other family members tried to explain to K.H. that she was mistaken.

Crystal Soberg, a Child Life Specialist familiar with the victim's case, was also

present when Ms. Pegues told K.H. of the victim's death. Ms. Lobbins said that K.H. was very sad when she learned of the victim's death, and then she started getting angry and "words started rattling off, you know, 'well, mom, you know what he does to her. You know, what he does to her when you're at work, when you're gone all day and I hear him hitting her.'" K.H. was angry with Ms. Pegues for leaving the house. Ms. Soberg said that K.H. told Ms. Pegues that the Petitioner was "who[p]ping" the victim, and Ms. Pegues tried to clarify that the Petitioner was burping the victim. "But, [K.H.] was sure that [she] heard. He was who[p]ping the [victim]."

K.H. testified that she was nine years old and in the fourth grade. She testified that the Petitioner was her stepfather, and Ms. Pegues was her mother. K.H. recalled the morning of this incident, saying that she was watching television in her bed with the victim in her bed, and she placed the victim right beside her so the victim would not roll off the bed. K.H. said the victim was "fussy" but not crying that morning. The victim was crying "a little later in the morning" when K.H. "put [her] hand over [the victim's] mouth so she couldn't breathe." After that, K.H. took the victim to the Petitioner and went to her room crying because she felt guilty about putting her hand over the victim's mouth. Then K.H. "started hearing noise from the living room" that "sounded like who[p]pings," but she was not sure "if [the Petitioner] whipped [the victim] or not [.]" K.H. did not "believe" that the Petitioner whipped the victim, but she agreed that she heard noises that sounded like "who[p]pings." She did not remember if the Petitioner hit the victim.

K.H. testified that the Petitioner called 911 and that he gave the victim some medicine "a couple of minutes later" after she heard the whopping sounds. Emergency personnel came to the house and took the victim to the hospital. K.H. remembered that the victim was in the Petitioner's lap on the couch after K.H. brought her to him. K.H. recalled bumping the victim "a little bit" into the couch when she gave the victim to the Petitioner. She said it was an accident. K.H. agreed that she remembered the Petitioner telling the victim that she was "going to learn to stop crying[.]"

Letitia Cole testified that she was a forensic interviewer at the Memphis Child Advocacy Center and interviewed K.H. in connection with the victim's death. Ms. Cole recalled that K.H. was "clear" about what had happened to the victim. Ms. Cole recalled that K.H. did not tell her about putting her hand over the victim's mouth, but she said that the victim started crying and the Petitioner asked K.H. to bring the victim to him. K.H. told Ms. Cole about hearing noises in the other room that "sounded like someone was getting a who [p]ping." K.H. also told Ms. Cole that it sounded like a belt was being used and that the Defendant had spanked the victim in the past.

Vicki Watts, with the Department of Children's Services, spoke with K.H. on the day the victim died. K.H. stated that she was watching the victim in her bedroom and the

6

victim became irritable, starting to cry. K.H. put the victim in her car seat and started to rock her in the car seat to try to soothe her. K.H. stated that she picked the victim up out of the car seat trying to get the victim to watch television with her but the Defendant came in and got the victim and took her into another room. K.H. said "she didn't see anything" but "that it sounded like [the Petitioner] was hitting [the victim] with a belt. [K.H.] stated that [the victim] was crying so loud to where she became hoarse." Ms. Watts remembered K.H. telling her that she heard the Petitioner tell the victim that she was "going to learn to stop crying[.]"

Ms. Watts also spoke with the Petitioner that day. The Petitioner told Ms. Watts that if the victim's autopsy report showed that she had broken ribs, it would be because "911 told him to do CPR."

Dr. Karen Lakin testified that she was an Assistant Professor of Pediatrics at the University of Tennessee and the Medical Director at the hospital where the victim was treated. Dr. Lakin testified as an expert witness in the fields of general pediatrics and child maltreatment and abuse.

> She stated that she was asked to review the victim's records by the Department of Children's Services and by the District Attorney's Office. Dr. Lakin was provided the victim's hospital records from April 26, 2012, and June 25, 2012. The paramedics' records, reports from the investigation, interviews, and autopsy records were also provided to Dr. Lakin.

> Dr. Lakin testified that the victim was seen in the hospital's emergency department on April 26, 2012, for "facial bruising that was reported to have occurred from falling from the bed while [the victim] was sleeping with [the Petitioner.]" Dr. Lakin testified that the victim returned to the hospital on June 25, 2012, in "extremely critical condition" and then died at 1:20 p.m. on June 25 while in the hospital. The cause of death listed on the autopsy was "multiple blunt force injuries."

> Dr. Lakin testified that the victim arrived at the hospital at 11:11 a.m. on June 25, 2012. Dr. Lakin explained that blood was drawn from the victim very quickly to allow the staff to "get a lot of information quickly" about the victim. Within a few minutes of the victim's arrival, blood tests indicated that the victim's "hematocrit" level, the percentage of red cells in the body, was 23 and her "hemoglobin" level, or blood protein level, was 7.8. Dr. Lakin testified that those values "were almost half of what the normal value should be" in an infant. A second round of blood was drawn and tested seventeen minutes later, and the victim's hematocrit level had

dropped to 13.6 and her hemoglobin level to 4.6. Dr. Lakin stated that the normal hematocrit level was around 35 to 40 and the normal hemoglobin level was about 10 to 12. The dramatic drop between the two blood tests indicated that the victim was "actively bleeding."

Based on the victim's autopsy reports, Dr. Lakin testified that the victim had "a number of injuries." Dr. Lakin further testified:

> [The victim] had a number of abnormalities on arrival in her lab work including her sodium was very high, her chloride was very high. The carbon dioxide was low. Everything was just very deranged which is something that we do see in a child that is suffering from shock. Also . . . there are enzymes that are produced by the liver. And so even before the autopsy there was huge concern that there may have been some type of liver trauma because [the enzyme levels] . . . you can see the normal values are 20 to 64. So we're talking, you know, [the victim's enzyme levels were] thousands of times the normal level.
>
> And as well there is another enzyme that's associated with the pancreas and it was also extremely high. So there was already concern of some type of intra abdominal injury that was going on. . . ."

Dr. Lakin testified that "heightened enzyme levels" are a "marker for blunt force trauma." Dr. Lakin testified that the victim had a "subdural hemorrhage" and explained:

> A subdural hemorrhage is very concerning in and of itself[,] by itself for non-accidental trauma in the absence of a history of significant head trauma. It's an unusual place to get bleeding to begin with because . . . that dura is adhered fairly close to the brain itself. And so in order for those vessels to rupture, you have to have some significant trauma to [the] head in order for those—for vessels to rupture. Subdural hemorrhage is commonly associated with abusive head trauma in [an] infant because . . . one of the mechanisms that we believe occurs is very rapid acceleration, deceleration injuries that occur with violent shaking. And that's why it so alarms pediatricians when we see a diagnoses of subdural hemorrhage and is considered one of the highly suspicious

8

injuries.

Dr. Lakin testified that it was her opinion that the victim's head injuries came from at least two different blows.

Dr. Lakin testified that the victim had two areas of rib fractures on her left side. Some of the rib fractures were older, as indicated by the calluses on the bone. The area of rib fracture on the victim's right side was acute, meaning there was no callus formation. About the hemorrhages in the victim's lung, Dr. Lakin stated that they were "very concerning for blunt trauma, very unusual."

Dr. Lakin testified about the injuries to the victim's liver and adrenal glands. The injury to her liver was "in a crush pattern" and "look[ed] like ground beef," meaning that the tissue in the victim's liver was "falling apart." The injuries to the victim's adrenal glands were "highly, highly, highly, unusual, very rare, not only in children but adults outside of any significant history of trauma like major car accident, major blunt force trauma to the abdomen." Dr. Lakin stated that an adrenal gland injury occurs in children "that have sustained blunt force trauma, major trauma from motor vehicle accidents or from falling from numerous stories [out of a building], two or three story falls . . . . They are very significant injuries. And then the other high [rate] of adrenal injuries is from inflicted abdominal trauma."

Dr. Lakin testified that the victim had lost approximately half of her blood volume due to "extensive hemorrhag[ing.]" This was consistent with the paramedic's description of the victim barely breathing and not focusing which Dr. Lakin stated indicated the victim was in "shock and coma."

Dr. Lakin stated that there was no chance that the victim's injuries could have been sustained during CPR or by being bumped into a piece of furniture. She denied that the victim's eight-year-old sibling could have caused these injuries because the injuries were "very significant" and not the type of injury sustained "during routine play." Knowing that the victim's sibling was a fifty-pound child made it even less likely in Dr. Lakin's opinion that the sibling caused the victim's injuries because "children are not typically characterized as being able to even have the strength to inflict that type of trauma." Dr. Lakin stated that with the injuries to the victim's liver and adrenal glands, it was unlikely that the victim was able to cry, or any crying would have been brief before losing consciousness.

9

*Id.,* 2015 WL 3404736, at \*7-8.

The Petitioner presented witnesses who testified that K.H. displayed some jealous behaviors toward the victim. Based upon this evidence, the jury convicted the Petitioner of two counts of first degree felony murder, one count of aggravated child abuse, and one count of aggravated child neglect. *Id.* at \*1. The trial court merged the Petitioner's felony murder conviction and imposed a sentence of life. The trial court sentenced the Petitioner to an effective sentence of twenty years for the remaining convictions and ordered that it run consecutively to his life sentence. *Id.* at \*11. On appeal, this Court affirmed the sufficiency of the evidence supporting his convictions. *Id.* at \*1.

## B. Post-Conviction Facts

The Petitioner filed a petition for post-conviction relief in which he alleged that his trial counsel, "Counsel," was ineffective when he cross-examined the medical examiner. At the hearings on the petition, the parties presented the following evidence: Counsel testified that she cross-examined three witnesses, including Dr. Ross and Dr. Lakin. She recalled reviewing Dr. Ross's report but could not recall if Dr. Lakin had created a report. Counsel said the purpose of Dr. Ross's testimony was to inform the jury of the manner of the victim's death and whether the death had been ruled a natural death, a suicide, an accident, or a homicide. In cross-examination, Counsel elicited from Dr. Ross that the injuries could have been caused by a child. Counsel said she did not recall there being information in Dr. Ross's report about "calluses," which would have been indicative of a prior injury.

Counsel testified that there was some indication that the victim had a prior injury from falling off a bed. She filed a motion in limine to prevent the State from introducing testimony regarding this incident. She did not recall whether she also filed a motion in limine to prevent the State from introducing testimony about calluses. Counsel testified, however, that the defense was that K.H. was the perpetrator of these injuries, so it may have been a strategic decision to allow that information in to support that theory, but Counsel did not definitively recall. She agreed that a history of calluses could indicate a history of child abuse, but she again indicated that such evidence could support K.H. as the perpetrator.

Counsel recalled that the State brought in Dr. Lakin to testify about whether there were any indicia of child abuse from the victim's injuries, in part because, during cross-examination, the defense had successfully obtained Dr. Ross's admission that another child could have caused the victim's injuries. Counsel testified that Dr. Lakin described the victim's injuries and then opined that another child could not have inflicted those injuries. Counsel did not recall how repetitive Dr. Lakin's testimony was to Dr. Ross's

testimony, and she did not recall whether she objected on these grounds.

Counsel recalled that they presented a theory that K.H. could have stomped on the victim. She did not recall if they provided the jury with an alternative explanation of how K.H. could have inflicted the injuries. The defense offered testimony that K.H. had "badly clawed" the victim and that she had bumped the victim's head on a sofa. She conceded that they may not have asked about K.H. hitting the victim in the head.

Counsel recalled Ms. Watts from DCS testifying about K.H.'s statements. She said that she did not object on hearsay grounds because the testimony was in essence impeachment of K.H., who had testified that she did not recall making any of those statements to Ms. Watts.

During cross-examination, Counsel testified that she had worked in the public defender's office for twenty-two years. She had represented multiple clients facing the same or similar charges to the ones faced by the Petitioner. She and her co-counsel interviewed multiple witnesses in preparation for trial. She met with Dr. Ross and attempted to hire an expert, Dr. Jane Turner, to counter the State's proof. Dr. Turner helped her prepare for her interview and cross-examination of Dr. Ross. Dr. Turner ultimately did not return Counsel's calls toward the trial date and did not appear at the trial.

During redirect, Counsel testified that, because Dr. Lakin did not assist their defense, the defense team wanted Dr. Lakin's testimony cut short and did not want to give her a chance to elaborate on her opinion. Therefore, they chose not to cross-examine her.

Co-counsel testified that she also represented the Petitioner. She agreed that she did not lodge a hearsay objection to an officer's testimony about statements he overheard the older child make. She said she could not explain why she did not object. She said she similarly did not lodge a hearsay objection to Ms. Cole's testimony. Co-counsel explained that her office did not object to every hearsay statement as part of a trial strategy. In this case, the older child had given conflicting statements, and the defense team wanted that presented to the jury. Co-counsel said that they were able to point to statements that indicated that the older child had lied and also that one of the State's experts admitted that a child could have caused the victim's injuries. Further, the mother agreed that she would not leave the older child alone with the victim, and the older child said that she had covered the victim's mouth and nose with her hand.

Co-counsel said that she did object to testimony from various witnesses who testified that the older child said that her mother knew that the Petitioner hit the victim while her mother was at work. The trial court ruled that these statements were excited

utterances.

During cross-examination, Co-counsel testified that she had been practicing law for approximately twenty-five years, focusing in criminal law. Co-counsel said that, before trial, she met with the Petitioner, the Petitioner's wife's grandmother, who had custody of the older child, and that she conducted a "thorough investigation."

Based upon this evidence, the post-conviction court denied the Petitioner's petition for post-conviction relief. It found:

> In the hearing, trial counsel demonstrated that they were prepared for trial, and had a defense theory that guided their actions. There is no proof that they performed deficiently. The fact that one can now sit back and think of more questions for a particular witness does not indicate that the questioning at trial was insufficient.
>
> In the case at ha[n]d, trial counsel made sound, but unsuccessful tactical decisions.
>
> [The] Petitioner is not allowed relief based upon hindsight or second-guessing. *Adkins vs. State of Tennessee*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). The Petitioner has failed to carry his burden of proof, and the Petition for Post- Conviction Relief is hereby denied.

The Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner contends that the post-conviction court erred when it denied him post-conviction relief. He asserts that Counsel and Co-counsel were ineffective because they failed to cross examine Dr. Ross about the vulnerability of a three month old child, the amount of weight that would be necessary to inflict the victim's injuries, and the means by which the older child could have inflicted the injuries, including by crushing her with the weight of her own body. The State counters that the Petitioner failed to question either counsel at the post-conviction hearing about their reasoning for not going into this line of questioning. Further, the State asserts that this court cannot speculate about whether this was a strategic decision in light of the fact that the Petitioner did not call Dr. Ross as a witness at the post-conviction hearing. The State finally asserts that the Petitioner cannot prove that he was prejudiced by his counsels' representation of him. We agree with the State.

12

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2014). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2014). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999) (citing *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997)). A post-conviction court's factual findings are subject to a de novo review by this Court; however, we must accord these factual findings a presumption of correctness, which can be overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely de novo review by this Court, with no presumption of correctness. *Id.* at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, "a petitioner must show that counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland*, 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court should avoid the "distorting effects of hindsight" and "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 689-90. In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "'The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation.'" *House*, 44 S.W.3d at 515 (quoting *Goad*, 938 S.W.2d at 369).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the Strickland test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

In this case, the post-conviction court found that Counsel and Co-counsel were not deficient when they made tactical decisions. We conclude that the evidence does not preponderate against the post-conviction court's findings of fact. Counsel and Co-counsel were presented with a difficult set of facts upon which to base their defense of the Petitioner. The Petitioner was the sole adult caring for the victim at the time she sustained her injuries. K.H. informed her mother before this that the Petitioner had been "whopping" the victim while her mother was at work. The victim, a mere three months old, had both healing and fresh injuries. She suffered significant, traumatic, and life-ending injuries while in the Petitioner's care. Counsel and Co-counsel attempted to inculpate the only other person present, an eight-year-old child, as the perpetrator of the victim's injuries. They successfully got one of the State's experts, Dr. Ross, to admit that

it was possible for K.H. to have inflicted those injuries, but the other State witness was of the opinion that this was not a possibility. After Dr. Ross admitted this possibility, Counsel and Co-counsel chose not to take the questioning farther. As noted by the State, this was likely a strategic decision. Dr. Ross did not testify at the post-conviction hearing, and this court cannot speculate about what Dr. Ross's answers might have been had Counsel and Co-counsel questioned him further. The Petitioner has not proven that he is entitled to relief.

## III. Conclusion

In accordance with the foregoing reasoning and authorities, we affirm the post-conviction court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE

15